(Slip Opinion) OCTOBER TERM, 2016 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BANK OF AMERICA CORP. ET AL. *v*. CITY OF MIAMI, FLORIDA

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 15–1111.   Argued November 8, 2016—Decided May 1, 2017*

The City of Miami filed suit against Bank of America and Wells Fargo (Banks), alleging violations of the Fair Housing Act (FHA or Act). The FHA prohibits, among other things, racial discrimination in connection with real-estate transactions, 42 U. S. C. §§3604(b), 3605(a), and permits any "aggrieved person" to file a civil damages action for a violation of the Act, §§3613(a)(1)(A), (c)(1).  The City's complaints charge that the Banks intentionally targeted predatory practices at African-American and Latino neighborhoods and residents, lending to minority borrowers on worse terms than equally creditworthy nonminority borrowers and inducing defaults by failing to extend refinancing and loan modifications to minority borrowers on fair terms. The City alleges that the Banks' discriminatory conduct led to a disproportionate number of foreclosures and vacancies in majority-minority neighborhoods, which impaired the City's effort to assure racial integration, diminished the City's property-tax revenue, and increased demand for police, fire, and other municipal services.  The District Court dismissed the complaints on the grounds that (1) the harms alleged fell outside the zone of interests the FHA protects and (2) the complaints failed to show a sufficient causal connection between the City's injuries and the Banks' discriminatory conduct.  The Eleventh Circuit reversed.

*Held*:

1. The City is an "aggrieved person" authorized to bring suit under the FHA.  In addition to satisfying constitutional standing require-

_____

*Together with No. 15–1112, *Wells Fargo & Co. et al.* v. *City of Miami, Florida,* also on certiorari to the same court.

ments, see *Spokeo, Inc.* v. *Robins*, 578 U. S. ___, ___, a plaintiff must show that the statute grants the plaintiff the cause of action he or she asserts. It is presumed that a statute ordinarily provides a cause of action "only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U. S. ___, ___.

The City's claims of financial injury are, at the least, "arguably within the zone of interests" the FHA protects. *Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U. S. 150, 153. The FHA defines an "aggrieved person" as "any person who" either "claims to have been injured by a discriminatory housing practice" or believes that such an injury "is about to occur," 8 U. S. C. §3602(i). This Court has said that the definition of "person aggrieved" in the original version of the FHA "showed 'a congressional intention to define standing as broadly as is permitted by Article III of the Constitution,'" *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205, 209; and has held that the Act permits suit by parties similarly situated to the City, see, *e.g., Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S. 91 (village alleging that it lost tax revenue and had the racial balance of its community undermined by racial-steering practices). Against the backdrop of those decisions, Congress did not materially alter the definition of person "aggrieved" when it reenacted the current version of the Act.

The Banks nonetheless contend that the definition sets boundaries that fall short of those the Constitution sets. Even assuming that some form of their argument is valid, this Court concludes that the City's financial injuries fall within the zone of interests that the FHA protects. The City's claims are similar in kind to those of the Village of Bellwood, which the Court held in *Gladstone*, *supra*, could bring suit under the FHA. The Court explained that the defendants' discriminatory conduct adversely affected the village by, among other things, producing a "significant reduction in property values [that] directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services." *Id.,* at 110–111. The City's alleged economic injuries thus arguably fall within the FHA's zone of interests, as this Court has previously interpreted that statute. *Stare decisis* principles compel the Court's adherence to those precedents, and principles of statutory interpretation demand that the Court respect Congress' decision to ratify those precedents when it reenacted the relevant statutory text. Pp. 5–9.

2. The Eleventh Circuit erred in concluding that the complaints met the FHA's proximate-cause requirement based solely on the finding that the City's alleged financial injuries were foreseeable results

of the Banks' misconduct. A claim for damages under the FHA is akin to a "tort action," *Meyer* v. *Holley*, 537 U. S. 280, 285, and is thus subject to the common-law requirement that loss is attributable "'to the proximate cause, and not to any remote cause,'" *Lexmark*, 572 U. S., at ___. The proximate-cause analysis asks "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.,* at ___. With respect to the FHA, foreseeability alone does not ensure the required close connection. Nothing in the statute suggests that Congress intended to provide a remedy for any foreseeable result of an FHA violation, which may " 'cause ripples of harm to flow' " far beyond the defendant's misconduct, *Associated Gen. Contractors of Cal., Inc.* v. *Carpenters*, 459 U. S. 519, 534; and doing so would risk "massive and complex damages litigation," *id.,* at 545. Rather, proximate cause under the FHA requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes* v. *Securities Investors Protection Corporation*, 503 U. S. 258, 268. The Court has repeatedly applied directness principles to statutes with "common-law foundations." *Anza* v. *Ideal Steel Supply Corp.*, 547 U. S. 451, 457. " 'The general tendency' " in these cases, " 'in regard to damages at least, is not to go beyond the first step.' " *Hemi Group, LLC* v. *City of New York*, 559 U. S. 1, 10. What falls within that step depends in part on the "nature of the statutory cause of action," *Lexmark*, *supra*, at ___, and an assessment " 'of what is administratively possible and convenient,' " *Holmes*, *supra*, at 268.

The Court declines to draw the precise boundaries of proximate cause under the FHA, particularly where neither the Eleventh Circuit nor other courts of appeals have weighed in on the issue. Instead, the lower courts should define, in the first instance, the contours of proximate cause under the FHA and decide how that standard applies to the City's claims for lost property-tax revenue and increased municipal expenses. Pp. 10–12.

No. 15–1111, 800 F. 3d 1262, and No. 15–1112, 801 F. 3d 1258, vacated and remanded.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed an opinion concurring in part and dissenting in part, in which KENNEDY and ALITO, JJ., joined. GORSUCH, J., took no part in the consideration or decision of the cases.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 15–1111 and 15–1112

————

BANK OF AMERICA CORPORATION, ET AL., PETITIONERS

15–1111          *v.*
CITY OF MIAMI, FLORIDA

WELLS FARGO & CO., ET AL., PETITIONERS

15–1112          *v.*
CITY OF MIAMI, FLORIDA

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[May 1, 2017]

JUSTICE BREYER delivered the opinion of the Court.

The Fair Housing Act (FHA or Act) forbids

> "discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . . ." 42 U. S. C. §3604(b).

It further makes it unlawful for

> "any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race . . . ." §3605(a).

The statute allows any "aggrieved person" to file a civil action seeking damages for a violation of the statute. §§3613(a)(1)(A), 3613(c)(1). And it defines an "aggrieved person" to include "any person who . . . claims to have been injured by a discriminatory housing practice." §3602(i).

The City of Miami claims that two banks, Bank of America and Wells Fargo, intentionally issued riskier mortgages on less favorable terms to African-American and Latino customers than they issued to similarly situated white, non-Latino customers, in violation of §§3604(b) and 3605(a). App. 185–197, 244–245, 350–362, 428. The City, in amended complaints, alleges that these discriminatory practices have (1) "adversely impacted the racial composition of the City," *id.,* at 232, 416; (2) "impaired the City's goals to assure racial integration and desegregation," *ibid.*; (3) "frustrate[d] the City's longstanding and active interest in promoting fair housing and securing the benefits of an integrated community," *id.,* at 232–233, 416–417; and (4) disproportionately "cause[d] foreclosures and vacancies in minority communities in Miami," *id.,* at 229, 413. Those foreclosures and vacancies have harmed the City by decreasing "the property value of the foreclosed home as well as the values of other homes in the neighborhood," thereby (a) "reduc[ing] property tax revenues to the City," *id.,* at 234, 418, and (b) forcing the City to spend more on "municipal services that it provided and still must provide to remedy blight and unsafe and dangerous conditions which exist at properties that were foreclosed as a result of [the Banks'] illegal lending practices," *id.,* at 233–234, 417. The City claims that those practices violate the FHA and that it is entitled to damages for the listed injuries.

The Banks respond that the complaints do not set forth a cause of action for two basic reasons. First, they contend that the City's claimed harms do not "arguably" fall within the "zone of interests" that the statute seeks to protect,

*Association of Data Processing Service Organizations, Inc.*
v. *Camp*, 397 U. S. 150, 153 (1970); hence, the City is not
an "aggrieved person" entitled to sue under the Act,
§3602(i). Second, they say that the complaint fails to draw
a "proximate-cause" connection between the violation
claimed and the harm allegedly suffered. In their view,
even if the City proves the violations it charges, the dis-
tance between those violations and the harms the City
claims to have suffered is simply too great to entitle the
City to collect damages.

We hold that the City's claimed injuries fall within the
zone of interests that the FHA arguably protects. Hence,
the City is an "aggrieved person" able to bring suit under
the statute. We also hold that, to establish proximate
cause under the FHA, a plaintiff must do more than show
that its injuries foreseeably flowed from the alleged statu-
tory violation. The lower court decided these cases on the
theory that foreseeability is all that the statute requires,
so we vacate and remand for further proceedings.

I

In 2013, the City of Miami brought lawsuits in federal
court against two banks, Bank of America and Wells
Fargo. The City's complaints charge that the Banks dis-
criminatorily imposed more onerous, and indeed "preda-
tory," conditions on loans made to minority borrowers than
to similarly situated nonminority borrowers. App. 185–
197, 350–362. Those "predatory" practices included,
among others, excessively high interest rates, unjustified
fees, teaser low-rate loans that overstated refinancing
opportunities, large prepayment penalties, and—when
default loomed—unjustified refusals to refinance or modify
the loans. *Id.,* at 225, 402. Due to the discriminatory
nature of the Banks' practices, default and foreclosure
rates among minority borrowers were higher than among
otherwise similar white borrowers and were concentrated

in minority neighborhoods. *Id.,* at 225–232, 408–415. Higher foreclosure rates lowered property values and diminished property-tax revenue. *Id.,* at 234, 418. Higher foreclosure rates—especially when accompanied by vacancies—also increased demand for municipal services, such as police, fire, and building and code enforcement services, all needed "to remedy blight and unsafe and dangerous conditions" that the foreclosures and vacancies generate. *Id.,* at 238–240, 421–423. The complaints describe statistical analyses that trace the City's financial losses to the Banks' discriminatory practices. *Id.,* at 235–237; 419–420.

The District Court dismissed the complaints on the grounds that (1) the harms alleged, being economic and not discriminatory, fell outside the zone of interests the FHA protects; (2) the complaints fail to show a sufficient causal connection between the City's injuries and the Banks' discriminatory conduct; and (3) the complaints fail to allege unlawful activity occurring within the Act's 2-year statute of limitations. The City then filed amended complaints (the complaints now before us) and sought reconsideration. The District Court held that the amended complaints could solve only the statute of limitations problem. It consequently declined to reconsider the dismissals.

The Court of Appeals reversed the District Court. 800 F. 3d 1262 (CA11 2015); 801 F. 3d 1258 (CA11 2015). It held that the City's injuries fall within the "zone of interests," *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U. S. ___, ___ (2014) (slip op., at 10), that the FHA protects. 800 F. 3d, at 1274–1275, 1277 (relying on *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205 (1972); *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S. 91 (1979); and *Havens Realty Corp.* v. *Coleman*, 455 U. S. 363 (1982)); 801 F. 3d, at 1266–1267 (similar). It added that the complaints adequately allege proximate cause. 800 F. 3d, at 1278; 801 F. 3d, at 1267. And it

remanded the cases while ordering the District Court to accept the City's complaints as amended. 800 F. 3d, at 1286; 801 F. 3d, at 1267.

The Banks filed petitions for certiorari, asking us to decide whether, as the Court of Appeals had in effect held, the amended complaints satisfied the FHA's zone-of-interests and proximate-cause requirements. We agreed to do so.

## II

To satisfy the Constitution's restriction of this Court's jurisdiction to "Cases" and "Controversies," Art. III, §2, a plaintiff must demonstrate constitutional standing. To do so, the plaintiff must show an "injury in fact" that is "fairly traceable" to the defendant's conduct and "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.* v. *Robins*, 578 U. S. \_\_\_, \_\_\_ (2016) (slip op., at 6) (citing *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992)). This Court has also referred to a plaintiff's need to satisfy "prudential" or "statutory" standing requirements. See *Lexmark,* 572 U. S., at \_\_\_–\_\_\_, and n. 4 (slip op., at 6–9, and n. 4). In *Lexmark*, we said that the label "'prudential standing'" was misleading, for the requirement at issue is in reality tied to a particular statute. *Ibid.* The question is whether the statute grants the plaintiff the cause of action that he asserts. In answering that question, we presume that a statute ordinarily provides a cause of action "only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.,* at \_\_\_ (slip op., at 10) (internal quotation marks omitted). We have added that "[w]hether a plaintiff comes within 'the zone of interests' is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.,* at \_\_\_ (slip op., at 8) (some internal quotation marks

omitted).

Here, we conclude that the City's claims of financial injury in their amended complaints—specifically, lost tax revenue and extra municipal expenses—satisfy the "cause-of-action" (or "prudential standing") requirement.  To use the language of *Data Processing*, the City's claims of injury it suffered as a result of the statutory violations are, at the least, "*arguably* within the zone of interests" that the FHA protects.  397 U. S., at 153 (emphasis added).

The FHA permits any "aggrieved person" to bring a housing-discrimination lawsuit.  42 U. S. C. §3613(a).  The statute defines "aggrieved person" as "any person who" either "claims to have been injured by a discriminatory housing practice" or believes that such an injury "is about to occur."  §3602(i).

This Court has repeatedly written that the FHA's definition of person "aggrieved" reflects a congressional intent to confer standing broadly.  We have said that the definition of "person aggrieved" in the original version of the FHA, §810(a), 82 Stat. 85, "showed 'a congressional intention to define standing as broadly as is permitted by Article III of the Constitution.'"  *Trafficante*, *supra*, at 209 (quoting *Hackett* v. *McGuire Brothers, Inc.*, 445 F. 2d 442, 446 (CA3 1971)); see *Gladstone, supra*, at 109 (similar); *Havens Realty*, *supra*, at 372, 375–376 (similar); see also *Thompson* v. *North American Stainless, LP*, 562 U. S. 170, 176 (2011) ("Later opinions, we must acknowledge, reiterate that the term 'aggrieved' [in the FHA] reaches as far as Article III permits"); *Bennett* v. *Spear*, 520 U. S. 154, 165–166 (1997) ("[*Trafficante*] held that standing was expanded to the full extent permitted under Article III by §810(a) of the Civil Rights Act of 1968").

Thus, we have held that the Act allows suits by white tenants claiming that they were deprived benefits from interracial associations when discriminatory rental practices kept minorities out of their apartment complex,

*Trafficante*, 409 U. S., at 209–212; a village alleging that it lost tax revenue and had the racial balance of its community undermined by racial-steering practices, *Gladstone*, 441 U. S*.,* at 110–111; and a nonprofit organization that spent money to combat housing discrimination, *Havens Realty*, 455 U. S., at 379. Contrary to the dissent's view, those cases did more than "sugges[t]" that plaintiffs similarly situated to the City have a cause of action under the FHA. *Post*, at 5. They held as much. And the dissent is wrong to say that we characterized those cases as resting on "ill-considered dictum." *Post*, at 4 (quoting *Thompson*, *supra*, at 176). The "dictum" we cast doubt on in *Thompson* addressed who may sue under Title VII, the employment discrimination statute, not under the FHA.

Finally, in 1988, when Congress amended the FHA, it retained without significant change the definition of "person aggrieved" that this Court had broadly construed. Compare §810(a), 82 Stat. 85, with §5(b), 102 Stat. 1619–1620 (codified at 42 U. S. C. §3602(i)) (changing "person aggrieved" to "aggrieved person" and making other minor changes to the definition). Indeed, Congress "was aware of" our precedent and "made a considered judgment to retain the relevant statutory text," *Texas Dept. of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.*, 576 U. S. \_\_\_, \_\_\_ (2015) (slip op., at 13). See H. R. Rep. No. 100–711, p. 23 (1988) (stating that the "bill adopts as its definition language similar to that contained in Section 810 of existing law, as modified to reaffirm the broad holdings of these cases" and discussing *Gladstone* and *Havens Realty*); cf. *Lorillard* v. *Pons*, 434 U. S. 575, 580 (1978) (Congress normally adopts our interpretations of statutes when it reenacts those statute without change).

The Banks do not deny the broad reach of the words "aggrieved person" as defined in the FHA. But they do contend that those words nonetheless set boundaries that fall short of those the Constitution sets. Brief for Petition-

ers in No. 15–1112, p. 12 (Brief for Wells Fargo); Brief for Petitioners in No. 15–1111, pp. 19–20 (Brief for Bank of America). The Court's language in *Trafficante*, *Gladstone*, and *Havens Realty*, they argue, was exaggerated and unnecessary to decide the cases then before the Court. See Brief for Wells Fargo 19–23; Brief for Bank of America 27–33. Moreover, they warn that taking the Court's words literally—providing everyone with constitutional standing a cause of action under the FHA—would produce a legal anomaly. After all, in *Thompson*, 562 U. S., at 175–177, we held that the words "'person claiming to be aggrieved'" in Title VII of the Civil Rights Act of 1964, the employment discrimination statute, did not stretch that statute's zone of interest to the limits of Article III. We reasoned that such an interpretation would produce farfetched results, for example, a shareholder in a company could bring a Title VII suit against the company for discriminatorily firing an employee. *Ibid.* The Banks say it would be similarly farfetched if restaurants, plumbers, utility companies, or any other participant in the local economy could sue the Banks to recover business they lost when people had to give up their homes and leave the neighborhood as a result of the Banks' discriminatory lending practices. Brief for Wells Fargo 18–19; Brief for Bank of America 22, 24–25. That, they believe, cannot have been the intent of the Congress that enacted or amended the FHA.

We need not discuss the Banks' argument at length, for even if we assume for argument's sake that some form of it is valid, we nonetheless conclude that the City's financial injuries fall within the zone of interests that the FHA protects. Our case law with respect to the FHA drives that conclusion. The City's complaints allege that the Banks "intentionally targeted predatory practices at African-American and Latino neighborhoods and residents," App. 225; *id.,* at 409 (similar). That unlawful conduct led to a "concentration" of "foreclosures and vacancies" in

those neighborhoods. *Id.,* at 226, 229, 410, 413. Those concentrated "foreclosures and vacancies" caused "stagnation and decline in African-American and Latino neighborhoods." *Id.,* at 225, 409. They hindered the City's efforts to create integrated, stable neighborhoods. *Id.,* at 186, 351. And, highly relevant here, they reduced property values, diminishing the City's property-tax revenue and increasing demand for municipal services. *Id.,* at 233–234, 417.

Those claims are similar in kind to the claims the Village of Bellwood raised in *Gladstone.* There, the plaintiff village had alleged that it was "'injured by having [its] housing market . . . wrongfully and illegally manipulated to the economic and social detriment of the citizens of [the] village.'" 441 U. S., at 95 (quoting the complaint; alterations in original). We held that the village could bring suit. We wrote that the complaint in effect alleged that the defendant-realtors' racial steering "affect[ed] the village's racial composition," "reduce[d] the total number of buyers in the Bellwood housing market," "precipitate[d] an exodus of white residents," and caused "prices [to] be deflected downward." *Id.,* at 110. Those circumstances adversely affected the village by, among other things, *producing a "significant reduction in property values [that] directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services." Id.,* at 110–111 (emphasis added).

The upshot is that the City alleges economic injuries that arguably fall within the FHA's zone of interests, as we have previously interpreted that statute. Principles of *stare decisis* compel our adherence to those precedents in this context. And principles of statutory interpretation require us to respect Congress' decision to ratify those precedents when it reenacted the relevant statutory text. See *supra*, at 7.

### III

The remaining question is one of causation: Did the Banks' allegedly discriminatory lending practices proximately cause the City to lose property-tax revenue and spend more on municipal services? The Eleventh Circuit concluded that the answer is "yes" because the City plausibly alleged that its financial injuries were foreseeable results of the Banks' misconduct. We conclude that foreseeability alone is not sufficient to establish proximate cause under the FHA, and therefore vacate the judgment below.

It is a "'well established principle of [the common] law that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause.'" *Lexmark*, 572 U. S., at ___ (slip op., at 13). We assume Congress "is familiar with the common-law rule and does not mean to displace it *sub silentio*" in federal causes of action. *Ibid.* A claim for damages under the FHA—which is akin to a "tort action," *Meyer* v. *Holley*, 537 U. S. 280, 285 (2003)—is no exception to this traditional requirement. "Proximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Lexmark*, *supra*, at ___ (slip op., at 14).

In these cases, the "conduct the statute prohibits" consists of intentionally lending to minority borrowers on worse terms than equally creditworthy nonminority borrowers and inducing defaults by failing to extend refinancing and loan modifications to minority borrowers on fair terms. The City alleges that the Banks' misconduct led to a disproportionate number of foreclosures and vacancies in specific Miami neighborhoods. These foreclosures and vacancies purportedly harmed the City, which lost property-tax revenue when the value of the properties in those neighborhoods fell and was forced to spend more on mu-

nicipal services in the affected areas.

The Eleventh Circuit concluded that the City adequately pleaded that the Banks' misconduct proximately caused these financial injuries. 800 F. 3d, at 1282. The court held that in the context of the FHA "the proper standard" for proximate cause "is based on foreseeability." *Id.*, at 1279, 1282. The City, it continued, satisfied that element: Although there are "several links in the causal chain" between the charged discriminatory lending practices and the claimed losses, the City plausibly alleged that "none are unforeseeable." *Id.*, at 1282.

We conclude that the Eleventh Circuit erred in holding that foreseeability is sufficient to establish proximate cause under the FHA. As we have explained, proximate cause "generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Lexmark*, *supra*, at \_\_\_ (slip op., at 14). In the context of the FHA, foreseeability alone does not ensure the close connection that proximate cause requires. The housing market is interconnected with economic and social life. A violation of the FHA may, therefore, "'be expected to cause ripples of harm to flow'" far beyond the defendant's misconduct. *Associated Gen. Contractors of Cal., Inc.* v. *Carpenters*, 459 U. S. 519, 534 (1983). Nothing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel. And entertaining suits to recover damages for any foreseeable result of an FHA violation would risk "massive and complex damages litigation." *Id.,* at 545.

Rather, proximate cause under the FHA requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes* v. *Securities Investors Protection Corporation*, 503 U. S. 258, 268 (1992). A damages claim under the statute "is analogous to a number of tort actions recognized at common law," *Curtis* v. *Loether*, 415 U. S. 189, 195 (1974), and we have repeatedly applied

directness principles to statutes with "common-law foundations," *Anza* v. *Ideal Steel Supply Corp.*, 547 U. S. 451, 457 (2006). "'The general tendency'" in these cases, "'in regard to damages at least, is not to go beyond the first step.'" *Hemi Group, LLC* v. *City of New York*, 559 U. S. 1, 10 (2010). What falls within that "first step" depends in part on the "nature of the statutory cause of action," *Lexmark*, *supra*, at ___ (slip op., at 14), and an assessment "'of what is administratively possible and convenient,'" *Holmes*, *supra*, at 268.

The parties have asked us to draw the precise boundaries of proximate cause under the FHA and to determine on which side of the line the City's financial injuries fall. We decline to do so. The Eleventh Circuit grounded its decision on the theory that proximate cause under the FHA is "based on foreseeability" alone. 800 F. 3d, at 1282. We therefore lack the benefit of its judgment on how the contrary principles we have just stated apply to the FHA. Nor has any other court of appeals weighed in on the issue. The lower courts should define, in the first instance, the contours of proximate cause under the FHA and decide how that standard applies to the City's claims for lost property-tax revenue and increased municipal expenses.

## IV

The judgments of the Court of Appeals for the Eleventh Circuit are vacated, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE GORSUCH took no part in the consideration or decision of these cases.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 15–1111 and 15–1112

_____

BANK OF AMERICA CORPORATION, ET AL.,
PETITIONERS
15–1111                    *v.*
CITY OF MIAMI, FLORIDA

WELLS FARGO & CO., ET AL., PETITIONERS
15–1112                    *v.*
CITY OF MIAMI, FLORIDA

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[May 1, 2017]

JUSTICE THOMAS, with whom JUSTICE KENNEDY and JUSTICE ALITO join, concurring in part and dissenting in part.

These cases arise from lawsuits filed by the city of Miami alleging that residential mortgage lenders engaged in discriminatory lending practices in violation of the Fair Housing Act (FHA). The FHA prohibits "discrimination" against "any person" because of "race, color, religion, sex, handicap, familial status, or national origin" with respect to the "sale or rental" of "a dwelling." 42 U. S. C. §3604; accord, §3605(a); §3606. Miami's complaints do not allege that any defendant discriminated against it within the meaning of the FHA. Neither is Miami attempting to bring a lawsuit on behalf of its residents against whom petitioners allegedly discriminated. Rather, Miami's theory is that, between 2004 and 2012, petitioners' allegedly discriminatory mortgage-lending practices led to defaulted loans, which led to foreclosures, which led to

vacant houses, which led to decreased property values, which led to reduced property taxes and urban blight. See 800 F. 3d 1262, 1268 (CA11 2015); 801 F. 3d 1258, 1266 (CA11 2015). Miami seeks damages from the lenders for reduced property tax revenues and for the cost of increased municipal services—"police, firefighters, building inspectors, debris collectors, and others"—deployed to attend to the blighted areas. 800 F. 3d, at 1269; 801 F. 3d, at 1263.

The Court today holds that Congress intended to remedy those kinds of injuries when it enacted the FHA, but leaves open the question whether Miami sufficiently alleged that the discriminatory lending practices caused its injuries. For the reasons explained below, I would hold that Miami's injuries fall outside the FHA's zone of interests. I would also hold that, in any event, Miami's alleged injuries are too remote to satisfy the FHA's proximate-cause requirement.

I

A plaintiff seeking to bring suit under a federal statute must show not only that he has standing under Article III, *ante*, at 5, but also that his "complaint fall[s] within the zone of interests protected by the law" he invokes, *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 7) (internal quotation marks omitted). The zone-of-interests requirement is "root[ed]" in the "common-law rule" providing that a plaintiff may "recover under the law of negligence for injuries caused by violation of a statute" only if "the statute 'is interpreted as designed to protect the class of persons in which the plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its violation.'" *Id.*, at \_\_\_, n. 5 (slip op., at 11, n. 5) (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts §36, pp. 229–230 (5th ed. 1984)).

We have "made clear" that "Congress is presumed to legislate against the background" of that common-law rule. *Lexmark*, 572 U. S., at \_\_\_ (slip op., at 10) (internal quotation marks omitted). We thus apply it "to all statutorily created causes of action . . . unless it is *expressly* negated." *Ibid.* (emphasis added; internal quotation marks omitted). "Whether a plaintiff comes within the zone of interests is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.*, at \_\_\_ (slip op., at 8) (internal quotation marks omitted).

## A

Nothing in the text of the FHA suggests that Congress intended to deviate from the zone-of-interests limitation. The statute's private-enforcement mechanism provides that only an "aggrieved person" may sue, §3613(a)(1)(A), and the statute defines "aggrieved person" to mean someone who "claims to have been injured by a discriminatory housing practice" or who believes he "will be injured by a discriminatory housing practice that is about to occur," §§3602(i)(1), (2). That language does not hint—much less expressly provide—that Congress sought to depart from the common-law rule.

We have considered similar language in other statutes and reached the same conclusion. In *Thompson* v. *North American Stainless, LP*, 562 U. S. 170 (2011), for example, we considered Title VII's private-enforcement provision, which provides that "'a person claiming to be aggrieved'" may file an employment discrimination charge with the Equal Employment Opportunity Commission. *Id.*, at 173 (quoting §2000e–5(b)). We unanimously concluded that Congress did not depart from the zone-of-interests limitation in Title VII by using that language. *Id.*, at 175–178. And in *Lexmark*, we interpreted a provision of the Lan-

ham Act that permitted "any person who believes that he or she is likely to be damaged by a defendant's false advertising" to sue. 572 U. S., at ___ (slip op., at 10) (internal quotation marks omitted). Even when faced with the broader "any person" language, we expressly rejected the argument that the statute conferred a cause of action upon anyone claiming an Article III injury in fact. We observed that it was unlikely that "Congress meant to allow all factually injured plaintiffs to recover," and we concluded that the zone-of-interests test was the "appropriate tool for determining who may invoke the cause of action" under the statute. *Id.,* at ___, ___ (slip op., at 10, 11) (internal quotation marks omitted).

To be sure, some language in our older precedents suggests that the FHA's zone of interests extends to the limits of Article III. See *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205, 209 (1972); *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S. 91, 109 (1979); *Havens Realty Corp.* v. *Coleman*, 455 U. S. 363, 372 (1982). But we have since described that language as "ill-considered" dictum leading to "absurd consequences." *Thompson*, 562 U. S., at 176. And we have observed that the "holdings of those cases are compatible with the "'zone of interests' limitation" described in *Thompson*. *Ibid.* That limitation provides that a plaintiff may not sue when his "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be assumed that Congress intended to permit the suit." *Id.*, at 178 (internal quotation marks omitted). It thus "exclud[es] plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions." *Ibid.*

B

In my view, Miami's asserted injuries are "so marginally related to or inconsistent with the purposes" of the FHA

that they fall outside the zone of interests. Here, as in any other case, the text of the FHA defines the zone of interests that the statute protects. See *Lexmark, supra*, at \_\_\_ (slip op., at 9). The FHA permits "[a]n aggrieved person" to sue, §3613(a)(1)(A), if he "claims to have been injured by a *discriminatory housing practice*" or believes that he "will be injured by a *discriminatory housing practice* that is about to occur," §§3602(i)(1), (2) (emphasis added). Specifically, the FHA makes it unlawful to do any of the following on the basis of "race, color, religion, sex, handicap, familial status, or national origin": "refuse to sell or rent . . . a dwelling," §3604(a); discriminate in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith," §3604(b); "make, print, or publish . . . any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination," §3604(c); "represent to any person . . . that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available," §3604(d); "induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of" certain characteristics, §3604(e); or discriminate in the provision of real estate or brokerage services, §§3605, 3606. The quintessential "aggrieved person" in cases involving violations of the FHA is a prospective home buyer or lessee discriminated against during the home-buying or leasing process. Our cases have also suggested that the interests of a person who lives in a neighborhood or apartment complex that remains segregated (or that risks becoming segregated) as a result of a discriminatory housing practice may be arguably within the outer limit of the interests the FHA protects. See *Trafficante, supra*, at 211 (concluding that one purpose of the FHA was to promote "truly integrated and balanced

living patterns" (internal quotation marks omitted)).

Miami's asserted injuries are not arguably related to the interests the statute protects. Miami asserts that it received "reduced property tax revenues," App. 233, 417, and that it was forced to spend more money on "municipal services that it provided and still must provide to remedy blight and unsafe and dangerous conditions," *id.*, at 417; see also *ante*, at 2. The city blames these expenditures on the falling property values and vacant homes that resulted from foreclosures. But nothing in the text of the FHA suggests that Congress was concerned about decreased property values, foreclosures, and urban blight, much less about strains on municipal budgets that might follow.

Miami's interests are markedly distinct from the interests this Court confronted in *Trafficante*, *Gladstone*, and *Havens*. In *Trafficante*, one white and one black tenant of an apartment complex sued on the ground that the complex discriminated against nonwhite rental applicants. 409 U. S., at 206–208. They argued that this discrimination deprived them of the social and economic benefits of living in an integrated community. *Id.*, at 208. In *Gladstone*, residents in a village sued based on alleged discrimination in the home-buying process. 441 U. S., at 93–95. They contended that white home buyers were steered away from a racially integrated neighborhood and toward an all-white neighborhood, whereas black home buyers were steered away from the all-white neighborhood and toward the integrated neighborhood. *Id.*, at 95. The plaintiffs thus alleged that they were "denied their right to select housing without regard to race." *Ibid.* (internal quotation marks omitted). The village also sued, alleging that the FHA violations were affecting its "racial composition, replacing what is presently an integrated neighborhood with a segregated one" and that its budget was strained from resulting lost tax revenues. *Id.*, at 110. Finally, in *Havens*, one white and one black plaintiff sued

after having posed as "testers," for the purpose of "collect-
ing evidence of unlawful steering practices."  455 U. S., at
373.  According to their complaint, the owner of an apart-
ment complex had told the white plaintiff that apartments
were available, but had told the black plaintiff that
apartments were not.  *Id.*, at 368.  The Court held that the
white plaintiff could *not* sue, because he had been provided
truthful information, but that the black plaintiff *could* sue,
because the FHA requires truthful information about
housing without regard to race.  *Id.*, at 374–375.  In all
three of these cases, the plaintiffs claimed injuries based
on racial steering and segregation—interests that, under
this Court's precedents, at least arguably fall within the
zone of interests that the FHA protects.

Miami's asserted injuries implicate none of those inter-
ests.  Miami does not assert that it was injured based on
efforts by the lenders to steer certain residents into one
neighborhood rather than another.  Miami does not even
assert that it was injured because its neighborhoods were
segregated.  Miami therefore is not, as the majority de-
scribes, "similarly situated" to the plaintiffs in *Trafficante*,
*Gladstone*, and *Havens*.  *Ante,* at 7.  Rather, Miami asserts
injuries allegedly resulting from foreclosed-upon and then
vacant homes.  The FHA's zone of interests is not so ex-
pansive as to include those kinds of injuries.

## C

The Court today reaches the opposite conclusion, resting
entirely on the brief mention in *Gladstone* of the village's
asserted injury of reduced tax revenues, and on principles
of *stare decisis*.  See *ante*, at 9.  I do not think *Gladstone*
compels the conclusion the majority reaches.  Unlike these
cases, *Gladstone* involved injuries to interests in "racial
balance and stability," 441 U. S., at 111, which, our cases
have suggested, arguably fall within the zone of interests
protected by the FHA, see *supra*, at 6.  The fact that the

village plaintiff asserted a budget-related injury *in addition to* its racial-steering injury does not mean that a city alleging *only* a budget-related injury is authorized to sue. A budget-related injury might be necessary to establish a sufficiently concrete and particularized injury for purposes of Article III, but it is not sufficient to satisfy the FHA's zone-of-interests limitation.

Although the Court's reliance on *Gladstone* is misplaced, its opinion today is notable primarily for what it does not say. First, the Court conspicuously does not reaffirm the broad language from *Trafficante*, *Gladstone*, and *Havens* suggesting that Congress intended to permit any person with Article III standing to sue under the FHA. The Court of Appeals felt bound by that language, see 800 F. 3d, at 1277; 801 F. 3d, at 1266, and we granted review, despite the absence of a circuit conflict, to decide whether the language survived *Thompson* and *Lexmark*, see Brief for Petitioner in No. 15–1111, p. i ("By limiting suit to 'aggrieved person[s],' did Congress require that an FHA plaintiff plead more than just Article III injury-in-fact?"); Brief for Petitioner in No. 15–1112, p. i ("Whether the term 'aggrieved' in the Fair Housing Act imposes a zone-of-interests requirement more stringent than the injury-in-fact requirement of Article III"). Today's opinion avoids those questions presented and thus cannot be read as retreating from our more recent precedents on the zone-of-interests limitation.

Second, the Court does not reject the lenders' arguments about many other kinds of injuries that fall outside of the FHA's zone of interests. We explained in *Thompson* that an expansive reading of Title VII's zone of interests would allow a shareholder "to sue a company for firing a valuable employee for racially discriminatory reasons, so long as he could show that the value of his stock decreased as a consequence." 562 U. S., at 177. Petitioners similarly argue that, if Miami can sue for lost tax revenues under

the FHA, then "plumbers, utility companies, or any other participant in the local economy could sue the Banks to recover business they lost when people had to give up their homes and leave the neighborhood as a result of the Banks' discriminatory lending practices." *Ante*, at 8 (citing petitioners' briefs). The Court today decides that it "need not discuss" this argument because *Gladstone* and *stare decisis* compel the conclusion that Miami can sue. *Ante*, at 8. That conclusion is wrong, but at least it is narrow. Accordingly, it should not be read to authorize suits by local businesses alleging the same injuries that Miami alleges here.

## II

Although I disagree with its zone-of-interests holding, I agree with the Court's conclusions about proximate cause, as far as they go. The Court correctly holds that "foreseeability alone is not sufficient to establish proximate cause under the FHA." *Ante*, at 10. Instead, the statute requires "'some direct relation between the injury asserted and the injurious conduct alleged.'" *Ante*, at 11 (quoting *Holmes* v. *Securities Investor Protection Corporation*, 503 U. S. 258, 268 (1992)).

After articulating this test for proximate cause, the Court remands to the Court of Appeals because it "decline[s]" to "draw the precise boundaries of proximate cause under the FHA" or to "determine on which side of the line the City's financial injuries fall." *Ante*, at 12. But these cases come to the Court on a motion to dismiss, and the Court of Appeals has no advantage over us in evaluating the complaint's proximate-cause theory. Moreover, the majority opinion leaves little doubt that neither Miami nor any similarly situated plaintiff can satisfy the rigorous standard for proximate cause that the Court adopts and leaves to the Court of Appeals to apply. See *ante*, at 11 ("The general tendency in these cases, in regard to damages

at least, is not to go beyond the first step" (internal quotation marks omitted)).

Miami's own account of causation shows that the link between the alleged FHA violation and its asserted injuries is exceedingly attenuated. According to Miami, the lenders' injurious conduct was "target[ing] black and Latino customers in Miami for predatory loans." Brief for Respondent in No. 15–1111, p. 4 (internal quotation marks omitted). And according to Miami, the injuries asserted are its "loss of tax revenues" and its expenditure of "additional monies on municipal services to address" the consequences of urban blight. *Id.*, at 6.

As Miami describes it, the chain of causation between the injurious conduct and its asserted injuries proceeds as follows: As a result of the lenders' discriminatory loan practices, borrowers from predominantly minority neighborhoods were likely to default on their home loans, leading to foreclosures. *Id.*, at 5–6. The foreclosures led to vacant houses. *Id.*, at 6. The vacant houses, in turn, led to decreased property values for the surrounding homes. *Ibid.* Finally, those decreased property values resulted in homeowners paying lower property taxes to the city government. *Ibid.* Also, Miami explains, the foreclosed-upon, vacant homes eventually led to "vagrancy, criminal activity, and threats to public health and safety," which the city had to address through the expenditures of municipal resources. *Ibid.* And all this occurred, according to Miami, between 2004 and 2012. See *ibid.* The Court of Appeals will not need to look far to discern other, independent events that might well have caused the injuries Miami alleges in these cases.

In light of this attenuated chain of causation, Miami's asserted injuries are too remote from the injurious conduct it has alleged. See *Associated Gen. Contractors of Cal., Inc.* v. *Carpenters*, 459 U. S. 519, 532, n. 25 (1983). Indeed, any other conclusion would lead to disquieting con-

sequences. Under Miami's own theory of causation, its injuries are one step further removed from the allegedly discriminatory lending practices than the injuries suffered by the neighboring homeowners whose houses declined in value. No one suggests that those homeowners could sue under the FHA, and I think it is clear that they cannot. Accordingly, I would hold that Miami has failed to sufficiently plead proximate cause under the FHA.

## III

For the foregoing reasons, I would reverse the Court of Appeals.