**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| CITY OF OAKLAND, A Municipal Corporation,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>WELLS FARGO & COMPANY; WELLS FARGO BANK, N.A.,<br>*Defendants-Appellants*. | No. 19-15169<br><br>D.C. No.<br>3:15-cv-04321-EMC<br><br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted En Banc June 23, 2021
Pasadena, California

Filed September 28, 2021

Before: Sidney R. Thomas, Chief Judge, and M. Margaret McKeown, Kim McLane Wardlaw, Richard A. Paez, Consuelo M. Callahan, Sandra S. Ikuta, Jacqueline H. Nguyen, Andrew D. Hurwitz, Ryan D. Nelson, Bridget S. Bade, and Lawrence VanDyke, Circuit Judges.

Opinion by Judge McKeown

# SUMMARY[*]

## Fair Housing Act

The en banc court affirmed in part and reversed in part the district court's partial grant and partial denial of Wells Fargo's motion to dismiss and remanded for dismissal of the City of Oakland's claims under the Fair Housing Act, alleging that Wells Fargo's discriminatory lending practices caused higher default rates, which in turn triggered higher foreclosure rates that drove down the assessed value of properties, and which ultimately resulted in lost property tax revenue and increased municipal expenditures.

The en banc court held that under *Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296 (2017), foreseeability alone is not sufficient to establish proximate cause under the Fair Housing Act, and there must be "some direct relation between the injury asserted and the injurious conduct alleged." The en banc court held that the downstream "ripples of harm" from Wells Fargo's alleged lending practices were too attenuated and traveled too far beyond Wells Fargo's alleged misconduct to establish proximate cause.

The en banc court affirmed the district court's dismissal of the City's damages claim related to increased municipal expenditures and reversed the district court's denial of Wells Fargo's motion to dismiss the damages claim related to lost

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

property tax revenue and claims for injunctive and declaratory relief.

The en banc court held that the City of Oakland did not sufficiently plead proximate cause for its reduced tax revenue claim because its theory of harm went beyond the first step of the causal chain, which was the harm to minority buyers who received predatory loans. The en banc court concluded that the Fair Housing Act is not a statute that supports proximate cause for injuries further downstream, and the extension of proximate cause beyond the first step was not administratively possible and convenient. For the same reasons, the City also failed sufficiently to plead proximate cause for its increased municipal expenses claim.

The en banc court held that, in addition to claims for damages, the proximate-cause requirement in *Miami* also applies to injunctive and declaratory relief. It therefore reversed the district court's judgment to the contrary.

---

## COUNSEL

Neal Kumar Katyal (argued), Colleen Roh Sinzdak, Benjamin A. Field, and Sean Marotta, Hogan Lovells US LLP, Washington, D.C.; Paul F. Hancock and Olivia Kelman, K&L Gates LLP, Miami, Florida; Edward P. Sangster and Daniel W. Fox, K&L Gates LLP, San Francisco, California; Terry E. Sanchez, Munger Tolles & Olson LLP, Los Angeles, California; Bart H. Williams and Manuel F. Cachan, Proskauer Rose LLP, Los Angeles, California; for Defendants-Appellants.

Robert S. Peck (argued), Center for Constitutional Litigation P.C., Washington, D.C.; Barbara J. Parker, Oakland City Attorney; Maria Bee, Chief Assistant City Attorney; Office of the City Attorney, Oakland, California; Joel Liberson, Trial & Appellate Resources P.C., Torrance, California; Yosef Peretz and Ruth Israely, Peretz & Associates, San Francisco, California; for Plaintiff-Appellee.

D. Scott Change, Housing Rights Center, Los Angeles, California; Jamie Crook, American Civil Liberties Union Foundation of Northern California, San Francisco, California; David Loy, American Civil Liberties Union of San Diego & Imperial Counties, San Diego, California; Julia Devanthéry, American Civil Liberties Union of Southern California, Los Angeles, California; Sandra S. Park and Alejandro Ortiz, American Civil Liberties Union Foundation, New York, New York; Morgan Williams, National Fair Housing Alliance, Washington, D.C.; Ajmel Quereshi, NAACP Legal Defense & Education Fund Inc., Washington, D.C.; for Amici Curiae American Civil Liberties Union Foundation, American Civil Liberties Union Foundation of Northern California, American Civil Liberties Union Foundation of Southern California, American Civil Liberties Union of San Diego & Imperial Counties, AARP, NAACP Legal Defense & Educational Fund Inc., National Fair Housing Alliance Inc., Poverty & Race Research Action Council, and Twelve Local Fair Housing Centers in the Ninth Circuit.

Dennis J. Herrera, City Attorney; Aileen M. McGrath, Co-Chief of Appellate Litigation; City Attorney's Office, San Francisco, California; for Amicus Curiae City and County of San Francisco.

Michael L. Newman, Senior Assistant Attorney General; Christine Chuang, Supervising Deputy Attorney General; Shubhra Shivpuri and Srividya Panchalam; California Department of Justice, Oakland, California; for Amicus Curiae State of California.

Daniel P. Kearney Jr. and Matthew E. Vigeant, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, D.C.; Steven P. Lehotsky and Emily J. Kennedy, U.S. Chamber Litigation Center, Washington, D.C.; for Amicus Curiae Chamber of Commerce of the United States of America.

Micha Star Liberty, Liberty Law, Oakland, California; Marcus J. Jackson and David M. Arbogast, Jackson Litigation, Carlsbad, California; for Amicus Curiae California Black Chamber of Commerce.

William Michael Cunningham, Washington, D.C., pro se Amicus Curiae.

## OPINION

McKEOWN, Circuit Judge:

Only a few years ago, the Supreme Court addressed the proximate-cause standard of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619, 3631, in *Bank of America Corp. v. City of Miami* ("*Miami*"), 137 S. Ct. 1296 (2017). Emphasizing that "foreseeability alone" is not sufficient to establish proximate cause, the Court required "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 1305–06 (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). In acknowledging that "[t]he housing market is interconnected

with economic and social life," the Court observed that "[a] violation of the FHA may, therefore, 'be expected to cause ripples of harm to flow' far beyond the defendant's misconduct." *Id.* at 1306 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 534 (1983)). Nonetheless, the Court limited the legal consequences of those ripples: "Nothing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel." *Id.*

The City of Oakland ("Oakland") claims that Wells Fargo's discriminatory lending practices caused higher default rates, which in turn triggered higher foreclosure rates that drove down the assessed value of properties, and which ultimately resulted in lost property tax revenue and increased municipal expenditures. These downstream "ripples of harm" are too attenuated and travel too "far beyond" Wells Fargo's alleged misconduct to establish proximate cause. *Id.* In this interlocutory appeal under 28 U.S.C. § 1292(b), we therefore reverse the district court's partial denial of Wells Fargo's motion to dismiss and remand for dismissal of the FHA claims.

## I. BACKGROUND

### A. FACTUAL BACKGROUND

According to Oakland's First Amended Complaint (the "Complaint"), Wells Fargo violated the FHA by engaging in mortgage-lending practices that discriminated against African-American and Latino borrowers. Oakland alleges that Wells Fargo had a longstanding "policy and practice of steering minority borrowers" into mortgage loans with "terms that have higher costs and risk features than more favorable and less expensive loans for which the borrower was eligible and which are regularly issued to similarly

situated white borrowers." Specifically, Oakland claims that Wells Fargo's practices resulted in giving a higher proportion of riskier "adjustable rate loans to minority borrowers than white borrowers" and giving "very few . . . conventional 30-year fixed rate mortgages" to minority borrowers.

According to Oakland, the discriminatory loans to minority borrowers increased default and foreclosure rates and decreased property values, which resulted in two economic harms: a decrease in property tax revenue and the simultaneous need for increased municipal expenditures to address public health and safety issues. Oakland also alleges that the discriminatory lending caused it non-economic injury by undermining its racial-integration goals.

To support its allegations that the discriminatory lending caused these harms, Oakland conducted a series of regression analyses. As Oakland notes, a regression analysis is a statistical method that examines "the relationship that exists in a set of data between a variable to be explained—called the 'dependent variable'—and one or more 'explanatory variables.'" Oakland "controll[ed] for borrower race and objective risk characteristics," to ensure that borrowers being compared were similarly situated—that is, that they "posses[ed] similar underwriting and borrower characteristics."

Based on Wells Fargo's own lending history data, Oakland found that, between 2004 and 2013, African-American and Latino borrowers were 2.583 and 3.312 times more likely, respectively, to receive loans with discriminatory terms than similarly situated white borrowers. Again controlling for "objective risk characteristics," Oakland found that the discriminatory loans were 1.753 times more likely to result in foreclosure than

non-discriminatory loans. These differences, according to Oakland, were statistically significant, meaning that there was less than a one percent chance that the observed differences would have occurred by chance. The Complaint alleges that the risky, expensive loans led to foreclosure at higher rates because "(1) the borrowers are required to make higher loan payments; and (2) as foreclosures begin to occur in a neighborhood, refinancing out of high-cost and high-risk loans becomes increasingly difficult due to suppressed loan-to-value ratios."

The higher default and foreclosure rates then allegedly decreased property values. The Complaint asserts that "[h]omes in foreclosure tend to experience a substantial decline in value," which in turn reduces Oakland's tax revenue.

The foreclosures also allegedly required Oakland to spend and divert resources to, among others, the police and fire departments, the Oakland Building Services Division and Code Enforcement, and the Oakland City Attorney's Office, to "remediate blighted conditions."

## B. PROCEDURAL BACKGROUND

Oakland sued Wells Fargo for damages as well as declaratory and injunctive relief. While the case was pending in the district court, the Supreme Court decided *Miami* and clarified the requirements for proximate cause under the FHA. 137 S. Ct. at 1305–06. The district court accordingly instructed Oakland to amend its complaint in light of *Miami*. Oakland did so, and Wells Fargo moved to dismiss.

The district court dismissed Oakland's claims as to increased municipal expenditures but allowed Oakland's

claims as to decreased property tax revenue to proceed. With respect to non-economic injuries, namely that discriminatory lending practices undermined Oakland's racial-integration goals, the district court dismissed Oakland's claim on standing grounds. Finally, the court allowed all claims for declaratory and injunctive relief to proceed, reasoning that *Miami*'s directness requirement "does not appear to extend" to these claims.

The district court certified two issues for interlocutory appeal under 28 U.S.C. § 1292(b): (1) whether Oakland's claims for damages satisfy the FHA's proximate-cause requirement, and (2) whether that proximate-cause requirement applies to claims for injunctive and declaratory relief.

A panel of this court affirmed the district court's determination that Oakland sufficiently pleaded proximate cause for the decreased property tax revenue claim; affirmed the district court's determination that Oakland failed to plead proximate cause for the increased municipal expenditures claim; and reversed the district court's determination that *Miami*'s proximate-cause requirement did not apply to injunctive and declaratory relief. *City of Oakland v. Wells Fargo & Co.*, 972 F.3d 1112, 1137 (9th Cir. 2020), *vacated*, 993 F.3d 1077 (9th Cir. 2021). We voted to rehear the case en banc. *City of Oakland v. Wells Fargo & Co.*, 993 F.3d 1077 (9th Cir. 2021).

## II. ANALYSIS

The FHA forbids "discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race." 42 U.S.C. § 3604(b). Apropos of the lending practices at issue here,

the statute also makes it unlawful for "any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race." *Id.* § 3605(a). Under the FHA, any "aggrieved person" may file a civil action seeking damages for a violation of the statute. *Id*. §§ 3613(a)(1)(A), (c)(1). An "aggrieved person" is defined to include "any person who . . . claims to have been injured by a discriminatory housing practice." *Id*. § 3602(i)(1).

Benchmarking Oakland's allegations against the requirements of the FHA, we review de novo whether Oakland adequately alleged proximate cause to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Pakootas v. Teck Cominco Metals, Ltd.*, 830 F.3d 975, 980 (9th Cir. 2016). To answer this question, we credit Oakland's well-pleaded allegations as true and look to the Court's guidance in *Miami*, along with its related proximate cause analysis in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), and *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), among other cases.

### A. UNDER *MIAMI*, PROXIMATE CAUSE UNDER THE FHA REQUIRES A DIRECT RELATION BETWEEN WELLS FARGO'S CHALLENGED PRACTICES AND OAKLAND'S ASSERTED INJURIES

In *Miami*, the Supreme Court considered allegations almost identical to those made here. 137 S. Ct. at 1300–01. The City of Miami alleged a series of predatory discriminatory practices by Bank of America and Wells Fargo, which resulted in higher default and foreclosure rates for minority borrowers than for similarly situated white

borrowers.  *Id.*  In turn, "[h]igher foreclosure rates lowered property values and diminished property-tax revenue."  *Id.* at 1301–02.  The "[h]igher foreclosure rates—especially when accompanied by vacancies—also increased demand for municipal services" necessary "to remedy blight and unsafe and dangerous conditions."  *Id.* at 1302.

The Eleventh Circuit held that Miami had adequately pleaded proximate cause because the harm to the city was a foreseeable result of the discriminatory lending.  *City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1282 (11th Cir. 2015), *vacated*, 137 S. Ct. 1296 (2017).  The Supreme Court squarely rejected the Eleventh Circuit's foreseeability standard, explaining that "[i]n the context of the FHA, foreseeability alone does not ensure the close connection that proximate cause requires."  137 S. Ct. at 1306.  Instead, the Court instructed that the proper standard was the more stringent "direct relation" standard, which requires "some direct relation between the injury asserted and the injurious conduct alleged."  *Id.* (quoting *Holmes*, 503 U.S. at 268).  This direct-relation standard previously had been applied by the Court to a number of common-law based statutes.  *See, e.g.*, *Lexmark*, 572 U.S. at 132–40 (applying the direct-relation standard to a claim brought under the Lanham Act); *Holmes*, 503 U.S. at 268–74 (same, under the Racketeer Influenced and Corrupt Organizations Act ("RICO")); *Associated Gen. Contractors of Cal., Inc.*, 459 U.S. at 540–46 (same, under the Clayton Act).  Citing to these cases, *Miami* held that the FHA "is no exception," because a damages claim under the FHA is "akin to a 'tort action.'" 137 S. Ct. at 1305 (quoting *Meyer v. Holley*, 537 U.S. 280, 285 (2003)).

In explaining the mechanics of the direct-relation standard, the Court began by reaffirming "[t]he general

tendency . . . not to go beyond the first step" of the causal chain. *Id.* at 1306 (internal quotation marks omitted) (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10 (2010)). The Court then noted, however, that "[w]hat falls within that 'first step' depends in part on the 'nature of the statutory cause of action' and an assessment 'of what is administratively possible and convenient.'" *Id.* (first quoting *Lexmark*, 572 U.S. at 133; and then *Holmes*, 503 U.S. at 268).

Although the parties urged the Court to delineate "precise boundaries" and to determine whether Miami's financial injuries met the direct-relation standard, the Court declined to do so and left it to "the lower courts [to] define, in the first instance, the contours of proximate cause under the FHA." *Id*. On remand, the Eleventh Circuit revisited the case and issued an opinion. *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260 (11th Cir. 2019), *vacated as moot*, 140 S. Ct. 1259 (2020). However, while a petition for writ of certiorari was pending, Miami voluntarily dismissed its lawsuit against Bank of America and other financial institutions. *See City of Miami v. Bank of Am. Corp.*, No. 13-cv-24506, slip op. at 1 (S.D. Fla. Jan. 30, 2020) (order granting plaintiff's unopposed motion for dismissal with prejudice); *City of Miami v. Wells Fargo & Co.*, No. 13-cv-24508, slip op. at 1 (S.D. Fla. Jan. 30, 2020) (order granting plaintiff's unopposed motion for dismissal with prejudice). The Court granted the petition and vacated the Eleventh Circuit's judgment as moot. *Wells Fargo & Co. v. City of Miami*, 140 S. Ct. 1259 (2020). Although there is no circuit precedent on the proximate-cause standard under the FHA, the Supreme Court's binding directives in *Miami* and its earlier proximate-cause jurisprudence drive our analysis.

**B. OAKLAND DID NOT SUFFICIENTLY PLEAD PROXIMATE CAUSE FOR ITS REDUCED TAX REVENUE CLAIM**

We begin where *Miami* began, with "[t]he general tendency . . . not to go beyond the first step." 137 S. Ct. at 1306 (internal quotation marks and citation omitted). There is no question that Oakland's theory of harm goes beyond the first step—the harm to minority borrowers who receive predatory loans. Oakland's theory of harm runs far beyond that—to depressed housing values, and ultimately to reduced tax revenue and increased municipal expenditures. Oakland thus fails "a strict application of the 'general tendency' not to stretch proximate causation 'beyond the first step.'" *Lexmark*, 572 U.S. at 139 (quoting *Holmes*, 503 U.S. at 271).

Oakland's hope in this case—which turns out to be misplaced—is that there is some basis not to "conform[] . . . to the general tendency" not to go beyond the first step. *Holmes*, 503 U.S. at 272. Indeed, there is some give in the joints as to "[w]hat falls within that 'first step.'" 137 S. Ct. at 1306 (quoting *Lexmark*, 572 U.S. at 139). That is, there are times when a proximate-cause analysis may appropriately diverge from the general tendency. Historically, the Court has framed this as going "beyond the first step," rather than expanding "what falls within" it. *See, e.g.*, *Lexmark*, 572 U.S. at 139 ("beyond the first step" (citation omitted)); *Hemi Grp.*, 559 U.S. at 10 (same); *Holmes*, 503 U.S. at 271 (same). We see no meaningful distinction between the historical framing of going "beyond" the first step and *Miami*'s framing of expanding what is considered to be "within" the first step. It is clear that both of these exceptions fall outside the norm and hinge on a statute-specific textual analysis of the "conduct the statute

prohibits." *Lexmark*, 572 U.S. at 133. Whether conceived as an expansive first step or an extension beyond the first step, what matters doctrinally is that some direct relation is required and that, under certain limited circumstances, courts need not "conform[]" to the general first-step tendency. *Holmes*, 503 U.S. at 271–72.

The Court in *Miami* articulated that these circumstances rest in part on two considerations: "the 'nature of the statutory cause of action' and an assessment 'of what is administratively possible and convenient.'"    137 S. Ct. at 1306 (first quoting *Lexmark*, 572 U.S. at 133; and then *Holmes*, 503 U.S. at 268).    We thus turn to these considerations.

### 1.   The Nature of the Statutory Cause of Action

The nature of a particular statutory cause of action implicates whether proximate cause can extend beyond the first step because some statutes support proximate cause for injuries further downstream. While the Supreme Court in *Miami* did not directly answer whether the FHA is such a statute, in our view the principles in *Miami* require us to conclude that it is not.

To begin, we examine the "injurious conduct" encompassed by the FHA. *Id*. (quoting *Holmes*, 503 U.S. at 268). According to *Miami*, the FHA prohibits "lending to minority borrowers on worse terms than equally creditworthy nonminority borrowers and inducing defaults by failing to extend refinancing and loan modifications to minority borrowers on fair terms." *Id.* at 1305. The harm that the statute guards against—issuing discriminatory loans that result in a default because of failure to refinance or modify the loans on fair terms—is thus situated at the first step: the issuance of the discriminatory loan. The harm to

the borrower has a clear direct relation to conduct prohibited by the FHA.

By contrast, the situations in which the Court has countenanced a finding of proximate cause beyond the first step arise from statutes that themselves encompass harm beyond the first step.  Two key cases illustrate this principle: *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008) and *Lexmark*, 572 U.S. 118.

In *Bridge*, the Court held that proximate cause extended beyond the first step for a RICO claim predicated on mail fraud.  553 U.S. at 661.  The case arose from a county auction of tax liens.  *Id.* at 642–44.  Whenever there was a tie between the highest bidders, the county awarded the lien based on a fair rotation of which bidder received the last lien from a tie bid.  *Id.* at 642–43.  To game the system, bidders began using multiple agents. *Id.* at 643.  The county banned that practice, but certain bidders allegedly continued using multiple agents and filed false attestations of compliance. *Id.* at 643–44.  Upon learning of this scheme, competing bidders sued, alleging that the fraud to the county harmed their chances of being awarded liens.  *Id.*  The wrinkle from a directness standpoint was that the first step was the false attestation to the county.  The offending bidders challenged both standing and proximate cause on the ground that the competing bidders had not relied on the false attestation.  *Id.* at 645–46.  The harm to the competing bidders did not come until later in the sequence.  *Id.*

Nonetheless, based on the nature of the mail fraud statute, the Court held that reliance on the misrepresentations was not "a prerequisite to establishing proximate causation." *Id*. at 661.  Key to the Court's analysis was a parsing of the statute and its conclusion that the statutory offense of mail fraud "does not require proof of reliance."  *Id*. at 656.  In this

way, the mail fraud statute permits proximate cause to extend beyond the first step to reach the harmed party—the competing bidder.    That extension was particularly necessary in *Bridge*, because the first-step party (the county) suffered no injury.  *Id.* at 658 (explaining that "respondents and other losing bidders were the *only* parties injured by petitioners' misrepresentations").  Contrasting this situation with *Holmes* and *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), the Court underscored that the competing bidders' "alleged injury—the loss of valuable liens—is the direct result of [the] fraud" and "there are no independent factors that account for [the] injury."  *Bridge*, 553 U.S. at 658.

Just two years later, in *Hemi Group*, the Court took the opportunity to highlight the principles from *Bridge*. 559 U.S. at 1.  Under RICO, New York City sued the Hemi Group, an online cigarette seller, for failure to file certain reports of sales.  *Id.* at 4.  New York's causal theory was that without those reports, it was unable to go after direct cigarette purchasers to collect tax revenue.  *Id.*  This theory was rejected because the city could not show that the failure to file reports "led directly to its injuries."  *Id.* at 14.  The city's effort to rely on *Bridge* fell flat.  *Id.* at 14–15.  Unlike the theory in *Bridge*, "the [c]ity's theory . . . [was] anything but straightforward: Multiple steps . . . separate[d] the alleged fraud from the asserted injury."  *Id.* at 15.  The Court's explanation that New York's theory "rest[ed] on the independent actions of third and even fourth parties," *id.*, echoes the attenuated, multi-step causal chain proffered by Oakland.

Consistent with *Bridge*, the Court in *Lexmark* considered another statute that permits proximate cause to extend beyond the first step: the false-advertising provisions of the

Lanham Act.  572 U.S 118.  Lexmark, a manufacturer and seller of laser printers and toner cartridges, dominated the market for cartridges compatible with its printers.  *Id*. at 120–21.  The question was whether Lexmark's alleged false advertising, which directly harmed certain printer cartridge "remanufacturing" companies, also proximately caused harm to Static Control, a company that made microchips exclusively for the remanufacturing companies.[1] *Id.* at 132–40.  Reasoning that proximate cause was satisfied, the Court rejected the view that consumer deception is an intervening step that breaks the proximate cause link*.  Id*. at 133, 140.

In coming to this conclusion, the Court examined the common-law origins of the Lanham Act's prohibition on false advertising, which justified a more flexible approach. *Id*. at 133.  Typically, the first step in a false advertising claim results from injuries "suffered by consumers who are deceived by the advertising."  *Id*.  But, as the Court put it, because the Lanham Act "authorizes suit only for commercial injuries," and because deceived consumers do not suffer commercial injuries, "the intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute."  *Id.* (citation omitted). Importantly, the Court did not jettison the directness requirement; rather, it noted that "a plaintiff can be directly injured by a misrepresentation even where 'a third party, and not the plaintiff, . . . relied on' it."  *Id.* (quoting *Bridge*, 553 U.S. at 656).  Even so, "the harm alleged" still must have

---

[1] Remanufacturers "acquire used Lexmark toner cartridges, refurbish them, and sell them in competition with new and refurbished cartridges sold by Lexmark."  *Id.* at 121.

"a sufficiently close connection to the conduct the statute prohibits." *Id.*

*Lexmark* further held that proximate cause could be extended beyond the direct competitor to another injured party, in that case Static Control, because the harm flowed automatically from the direct competitor remanufacturing companies to Static Control. *Id.* at 139–40. "[I]f the remanufacturers sold 10,000 fewer refurbished cartridges because of Lexmark's false advertising, then it would follow *more or less automatically* that Static Control sold 10,000 fewer microchips for the same reason . . . ." *Id.* at 140 (emphasis added). Because there was "something very close to a 1:1 relationship" between the number of cartridges sold (or not sold) by the remanufacturer and the number of microchips sold (or not sold) by the third-party chip manufacturer, the intervening step did not cut off proximate causation. *Id.* at 139. Emphasizing the "relatively unique circumstances," the Court held that the remanufacturers were not "more immediate victim[s]" than Static Control. *Id.* at 140 (quoting *Bridge*, 553 U.S. at 658).

Unlike the statutes in *Bridge* and *Lexmark*, the FHA provides a direct link between the prohibited conduct and the borrower but does not support stretching proximate cause principles beyond the first step.

Still, Oakland urges that *Miami*'s broad interpretation of the FHA for standing purposes is a reason to embrace a capacious proximate-cause standard. Before the district court, Oakland urged that "[i]t would be illogical for Oakland to have standing under the FHA to pursue lost property taxes and increased municipal expenses, but still be unable to state a claim for those very same injuries under the FHA's causation standard." The district court rejected that

argument, pointing out that statutory "[s]tanding is a separate issue from proximate cause."  We agree.

Indeed, it is critical to separate *Miami*'s holdings on two distinct and independent questions—statutory standing and proximate cause.  The Court first considered whether, for purposes of statutory standing, Miami was an "aggrieved person" under the FHA.  137 S. Ct. at 1302–05.  Giving that term a broad reading, the Court concluded that Miami alleged "economic injuries that arguably fall within the FHA's zone of interests."  *Id.* at 1305.  But that conclusion in no way controls the separate inquiry into proximate cause.  Put simply, "[p]roximate causation is not a requirement of Article III standing," and they are not coextensive.  *Lexmark*, 572 U.S. at 134 n.6.  And injury must have "a sufficiently close connection to the conduct the statute prohibits"—not simply any harm that Congress sought to target in enacting the statute.  *Miami*, 137 S. Ct. at 1305 (quoting *Lexmark*, 572 U.S. at 133).

## 2.  Administrability

Having determined that the nature of the statute does not warrant the extension of proximate cause beyond the first step, we turn to *Miami*'s second consideration: "what is administratively possible and convenient."  137 S. Ct. at 1306.  In articulating this inquiry, *Miami* cited to *Holmes*, where the Court laid out three factors relevant to administrability: (1) the ability to distinguish the "damages attributable to the violation, as distinct from other, independent, factors"; (2) "the risk of multiple recoveries"; and (3) whether more direct plaintiffs could "be counted on to vindicate the law as private attorneys general."  *Holmes*, 503 U.S. at 269–70 (citation omitted).

Before addressing the *Holmes* factors, we pause to clarify their role in the directness analysis. *Holmes* used these factors to determine whether the direct-relation standard applied to a particular statute, RICO. *Id.* We recently used the factors in the same way when assessing whether the direct-relation standard applied to the Anti-Terrorism Act. *Fields v. Twitter, Inc.*, 881 F.3d 739, 746 (9th Cir. 2018) ("The ATA presents precisely the risks with which the Court was concerned in *Holmes* . . . ."). In addition to using the factors to determine *whether* the direct-relation standard applies, the Court—as well as our court— have also used the factors in *applying* the direct-relation standard. *See Anza*, 547 U.S. at 456–60 (invoking the factors to "illustrate" an indirect injury); *see also Hemi Grp.*, 559 U.S. at 11–12; *Bridge*, 553 U.S. at 657–58; *Canyon County v. Syngenta Seeds, Inc*., 519 F.3d 969, 982–83 (9th Cir. 2008) (using the factors to support failure of proximate cause). By citing to *Holmes* in its description of the administrability component of the direct-relation standard, *Miami* appears to endorse the use of the *Holmes* factors within the application of the direct-relation standard. *Miami*, 137 S. Ct. at 1306. In light of this history, we view the *Holmes* factors as instructive, though not mandatory.

Here, the *Holmes* factors reinforce our view that Oakland has not met the directness requirement of the proximate-cause standard. The first factor is the ability to distinguish the "damages attributable to the violation, as distinct from other, independent, factors." *Holmes*, 503 U.S. at 269 (citation omitted). Oakland's theory of harm fails this test.

To begin, Oakland does not allege that an increase in foreclosures is "surely attributable" to the discriminatory lending. *Lexmark*, 572 U.S. at 140. Oakland's long and winding causal chain begins with the claim that Wells Fargo

initiated predatory loans to minority borrowers. Then, those borrowers were more likely to default on the loans. To trigger default, the borrower must quit making loan payments or violate some other term of the loan, such as maintaining mandatory insurance. The reason for default could be attributable to many independent factors, such as job loss, a medical hardship, a death in the family, a divorce, a fire or other catastrophe, Covid-19, broader economic trends, or any number of other unpredictable causes not present when the loan was made. And once default occurs, Oakland's chain of events then requires the act of foreclosure. According to the Complaint, Wells Fargo may have "sold the loan or servicing rights to a third party," which presumably initiated the foreclosures. Even in the face of default, whether to initiate foreclosure, renegotiate the loan, sell the loan, or even let it ride, is a decision that extends beyond Wells Fargo. (And even if Wells Fargo retained the loan, the same foreclosure decisions would inure.) The chain becomes even more attenuated when variables of property value (which could turn not only on foreclosure but neglect, criminal activity, changing demographics, and macroeconomic trends) and reduced tax revenues are piled on top of a cascading number of independent variables. Thus, Oakland's "theory of liability rests not just on separate *actions*, but separate actions carried out by separate *parties*," in some cases third, fourth, or fifth parties. *Hemi Grp.*, 559 U.S. at 11.

The difficulties in attributing damages here are a far cry from the situation in *Lexmark*, where the Court held that the harm flowed so "automatically" that there were no concerns about attributing damages. 572 U.S. at 140. Because Oakland only alleges that the discriminatory loans make foreclosure and decreased tax revenue more likely, there is not a 1:1 relationship between the discriminatory loan—the

conduct forbidden by the FHA—and decreased tax revenue. Oakland's alleged injuries are more similar to those of an unpaid "landlord" or "electric company" whose misfortune stems from a third party's "inability to meet [its] financial obligations." *Id.* at 134 (quoting *Anza*, 547 U.S. at 458). Any assessment of the actual relationship would require the "'speculative . . . proceedings' or 'intricate, uncertain inquiries'" that *Lexmark* cautioned against. *Id*. at 140 (quoting *Anza*, 547 U.S. at 459–60); *see also Anza*, 547 U.S. at 460 ("The element of proximate causation recognized in *Holmes* is meant to prevent these types of intricate, uncertain inquiries from overrunning . . . litigation.").

Oakland's efforts to fill these gaps in the causal chain through regression analyses fall short. By their own terms, the regression analyses only "show whether the fact that a loan had discriminatory terms made that loan more likely to result in foreclosure." They do not purport to show that discriminatory loans *automatically* result in decreased property values and then in decreased tax revenue. Thus, even accepting the results of the regression analyses as true, a court would be left with the unacceptable challenge of isolating the "damages attributable to the violation, as distinct from other, independent, factors." *Holmes*, 503 U.S. at 269 (citation omitted). Leaving aside whether statistical modeling could be used to buttress causation in the appropriate case—an issue we do not decide—Oakland's multiple but disconnected analyses here cannot be glued together to satisfy the directness requirement.

The second *Holmes* factor is whether allowing proximate cause to extend beyond the first step would require the court to "adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *Id*.

(citations omitted).   That risk is not present here because only Oakland (or a related administrative authority) could recover lost property tax revenue.  But while the presence of this risk can indicate the need to rigorously adhere to the first step analysis, nothing suggests that the absence of a risk of duplicative recoveries warrants extending beyond the first step.  *Anza*, 547 U.S. at 459.

The third *Holmes* factor is whether directly injured victims "can generally be counted on to vindicate the law as private attorneys general."  *Holmes*, 503 U.S. at 269–70. Here, the answer is yes.  Directly harmed borrowers can sue individually and are incentivized to do so through the availability of punitive damages, attorneys' fees, and equitable relief.  *See* 42 U.S.C. § 3613(c)(1)–(2) (describing the relief which may be granted under the FHA).  Harmed borrowers can also sue as a class.  *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 366–67 & n.3 (1982). Organizations can sue under the FHA and do so.  *See, e.g.*, *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project*, 576 U.S. 519, 526 (2015); *Havens*, 455 U.S. at 367. It also bears noting that the Department of Justice ("DOJ") can sue to enforce the FHA, 42 U.S.C. § 3614(a), and that the Department of Housing and Urban Development can refer certain FHA enforcement matters to the DOJ with a recommendation to sue, 42 U.S.C. § 3610(c).  According to the Complaint, the DOJ in fact sued Wells Fargo, which paid $175 million to resolve FHA fair lending claims based on discrimination in residential mortgage lending.  And, in a broader suit brought by the DOJ, Wells Fargo paid $1.2 billion for improper lending practices.   In short, Oakland does not stand in the shoes of a party that cannot vindicate violations under the FHA, and nothing in this case counsels broadening the universe of actionable harms. *See Anza*, 547 U.S. at 460.

Having followed *Miami* to consider the nature of the statute and what is administratively possible and convenient, we conclude that Oakland's claimed harm of reduced tax revenue is too remote from the cause of action and that nothing counsels going "beyond the first step" of proximate causation.

### C. OAKLAND DID NOT SUFFICIENTLY PLEAD PROXIMATE CAUSE FOR ITS INCREASED MUNICIPAL EXPENSES CLAIM

The district court dismissed Oakland's claim stemming from increased municipal expenditures. Although under 28 U.S.C. § 1292(b) the court certified Oakland's "claims for damages" in the plural, and without specificity as to which theory, in briefing the parties focused almost exclusively on the lost revenue claim. Nonetheless, because of the broad scope of certification, like the panel, we address this claim.

Despite Oakland's opportunity to amend the Complaint, its allegations are conclusory. The increased municipal expenditure claim is similar to the tax revenue theory, except that it introduces even more independent factors to the causal chain. For example, the theory relies not only on the fact that a home will be foreclosed upon and the other variables, but also that individual actors will commit civil and criminal violations, thus necessitating more city resources to avoid and remedy those harms. This claim, which lacks even a scintilla of directness between the FHA violation and the purported harm, is founded on speculation based on conjecture. Because this claim is even further afield from the alleged wrongdoing than the reduced tax revenue claim, it fails the proximate cause test for the same reasons.

### D. THE PROXIMATE-CAUSE REQUIREMENT IN *MIAMI* APPLIES TO INJUNCTIVE AND DECLARATORY RELIEF

The district court held that Oakland did not need to satisfy the proximate-cause requirement for the injunctive and declaratory relief claims. The district court erred in this regard—a point that, to its credit, Oakland does not contest on appeal. The Court in *Miami* held that proximate cause is required under the FHA, and in doing so, did not distinguish between claims for damages and those for declaratory and injunctive relief. 137 S. Ct. at 1305–06. We read *Miami* to require a showing of proximate cause for all claims arising under the FHA. This conclusion is buttressed by the Court's holding in *Lexmark* that proximate cause "is an element of the cause of action," 572 U.S. at 134 n.6, that must be established "in every case," *id*. at 135. Critically, *Lexmark* uniformly applied the proximate cause test without making any distinction between the damages and injunctive relief claims. *Id.* at 132–40. We reverse the district court's judgment to the contrary.

### CONCLUSION

We affirm the district court's dismissal of the damages claim related to increased municipal expenditures and reverse the district court's denial of Wells Fargo's motion to dismiss the damages claim related to lost property tax revenue and the claims for injunctive and declaratory relief.

**AFFIRMED in PART, REVERSED in PART, and REMANDED for dismissal of the FHA claims and proceedings consistent with this opinion. Costs shall be awarded to Wells Fargo.**